NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| G-I HOLDINGS AND SAMUEL J. HEYMAN, | : | **Hon. Dennis M. Cavanaugh** |
|  | : |  |
| Plaintiffs, | : | **OPINION** |
|  | : |  |
| v. | : | Civil Action No. 00-6189 (DMC) |
|  | : |  |
| RELIANCE INSURANCE COMPANY, HARTFORD FIRE INSURANCE COMPANY, TWIN CITY FIRE INSURANCE COMPANY, NEW JERSEY PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION AND NEW YORK PROPERTY/CASUALTY INSURANCE SECURITY FUND, | : | |
|  | : |  |
| Defendants. | : |  |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by New York Property/Casualty Insurance Security Fund's[1] ("the Fund" or "Defendant") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Civil Rule 7.1(i), no oral argument was heard. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that Defendant's motion to dismiss is

---

[1] Defendant notes that Plaintiffs improperly named the New York Property/Casualty Insurance Security Fund in their Third Amended Complaint and should have named the Superintendent of Insurance of New York ("Superintendent"). Also pending before the Court is Plaintiffs' cross-motion to name the Superintendent of Insurance of New York as a direct defendant.

**granted**.  Accordingly, Plaintiffs' cross-motion to amend the complaint is rendered moot, and is hereby **denied**.

I.    BACKGROUND

This is a coverage action brought by Plaintiffs G-I Holdings ("G-I") and Samuel J. Heyman ("Heyman") (collectively "Plaintiffs") for losses sustained in defending three fraudulent conveyance actions.  Plaintiffs originally brought suit against Reliance Insurance Company ("Reliance"), their primary insurer and Great American Insurance Company ("Great American"), their umbrella insurer pursuant to directors and officers ("D&O") policies.  Reliance has since become bankrupt and Hartford Fire Insurance Company ("Hartford") allegedly purchased the assets and renewal rights to Reliance's directors and officers book of business pursuant to an asset purchase agreement. Additionally, Plaintiffs joined New Jersey Property Liability Insurance Guaranty Association and the New York Property/Casualty Insurance Security Fund, alleging that they are statutorily obligated to make payments on Plaintiffs' covered claims due to Reliance's insolvency.

A.    **Previous Asbestos Litigations**

Beginning in the late 1970s, numerous actions were filed against GAF (the predecessor in interest to G-I), alleging bodily injury as a result of exposure to GAF's asbestos containing products and byproducts.  In September of 1988, GAF and a group of other asbestos defendants formed the Center for Claims Resolution, Inc. ("CCR"), a non-profit corporation created to administer and arrange for the evaluation, settlement, payment or defense of asbestos related claims against its members.  In 1993, CCR negotiated a settlement with representatives of a proposed class consisting of future asbestos claimants.  While the proposed settlement was initially approved by the United States District Court for the District of Eastern Pennsylvania in a decision captioned <u>Carlough v.</u>

Amchem Products, Inc., the Third Circuit subsequently vacated the settlement.  The Third Circuit's decision was affirmed by the Supreme Court.  See Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997).

By 1996, GAF was facing asbestos liability estimated to be approximately $213.8 million for existing claims, with the prospect of hundreds of thousands more such claims to be asserted in the future.  GAF terminated its membership in the CCR on January 17, 2000.  At that time GAF's liabilities totaled approximately $309.2 million.  Additionally, the CCR alleges that as of January 1, 1997, GAF was obligated to the CCR in the amount of $68.3 million for its share of defense costs and indemnity payments.

During all relevant times to this action Heyman served as the chief executive officer, controlling shareholder and chairman of the board of directors for GAF as well as the same for ISP.  Until January 1, 1997, GAF held 100% of the stock in ISP Holdings, Inc. ("ISPH").  ISPH owned 83.5% of the stock in ISP.  ISP had an annual income of about $67 million, total assets of $1.6 billion and stockholder's equity, net of minority public shares, of about $593 million.  Effective January 1, 1997, GAF made a transfer by distribution of 100% of GAF's ISPH shares to GAF's shareholders.  Heyman was the majority shareholder of GAF.  ISP later merged with ISPH and changed its name to International Specialty Products, Inc. ("ISPI").  Heyman then transferred a substantial part of his ISPI stock to his own companies.

During October and November of 2000, GAF and other newly created corporate subsidiaries were collapsed into a single entity, re-named as G-I Holdings.  G-I filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of New Jersey on January 5, 2001.

### B.    Underlying Fraudulent Conveyance Actions

Three lawsuits have been commenced against Plaintiffs, all alleging that the 1997 transfers constituted a fraudulent conveyance under New York law.  A putative class action was filed by Harry W. Nettles in the United States District Court for the Southern District of New York on January 3, 2000 ("Nettles claim").  Third Am. Compl. at ¶¶26-33.  That same year, the CCR filed an action against Plaintiffs on September 19, 2000 ("CCR action").  Id. at ¶¶34-38.  A year later, on September 17, 2001, the Official Committee of Asbestos Claimants of G-I in the Chapter 11 bankruptcy proceedings filed an action against Plaintiffs ("OCAC action").  Id. at ¶¶39-43.  The complaints in each of these actions allege that Plaintiffs transferred GAF shares to ISPH, in an effort to place these shares beyond the reach of GAF's creditors.  It is alleged that no consideration was paid to GAF for the transfer of ISPH's stock.  Based on these allegations, the plaintiffs in the underlying actions sought compensatory damages, equitable relief and punitive damages.

### C.    Reliance Insurance Agreement

Plaintiffs purchased from Reliance a primary D&O insurance policy, number NDA 0152124-99B, effective July 1, 1999 to July 1, 2002 ("the Reliance Policy").  Id. at ¶13.  Liability limits under the Reliance policy were $15 million per claim and in the aggregate subject to a $250,000 per claim deductible.  The Reliance Policy was cancelled effective July 1, 2000.  Id. at ¶13.  The Reliance D&O policy provides coverage to G-I to the extent it indemnifies Heyman for covered claims.  Additionally, the Reliance Policy provides direct coverage to Heyman for covered claims.

The Reliance Policy was written on a "claims made basis" and affords insurance to directors, officers and GAF for any "wrongful act which takes place during or prior to the policy period."  The policy further states that "[a]ll claims arising out of the same Wrongful Act or Interrelated Wrongful

Act of one or more of the Insureds shall be considered a single claim."[2]  Id. at ¶16.  The policy

contained a commercial general liability ("CGL") exclusion, barring coverage for a variety of

tortious or illegal acts.[3]  Additionally, the policy contained a "Pollution Exclusion."[4]  The policy

defined "pollutants," inter alia as, "asbestos or asbestos-containing products."

Plaintiffs gave Reliance notice of the CCR, OCAC and Nettles actions.  Id. at ¶¶44-53.  On

---

[2] "Wrongful Act" is defined as
    (1) any actual or alleged error, misstatement, misleading statement, act, omission,
    neglect or breach of duty, committed or attempted by the directors and officers, in
    their capacity as such, or in an Outside Position, or, with respect to Insuring
    Agreement (C), by the Company or
    (2) any matter claimed against the Directors and Officers solely by reason of their
    serving in such capacity or in an Outside Position.
"Interrelated Wrongful Acts" is defined as "Wrongful Acts that have as a common nexus
    any fact, circumstance, situation, event, transaction, cause or series of casually
    connected facts, circumstances, situations, events, transactions or causes."

[3] The Insurer shall not be liable to make any payment for Loss in connection with any
Claim made for Loss in connection with any Claim made against the Directors and Officers or,
with respect to Insuring Agreement (C), the Company:

    (A) for bodily injury, sickness, disease, emotional distress, mental anguish, outrage,
    humiliation, death, false arrest or imprisonment, abuse of process, malicious prosecution,
    defamation, violation or invasion of any right of privacy or private occupancy, trespass,
    nuisance or wrongful entry or eviction, or for damage to or destruction of any tangible
    property including loss of use thereof; . . .
    (D) brought or maintained by or on behalf of the Company or any Director or Officer, in
    any capacity

[4](E) for based upon, arising from, or in any way related to
    (1) the actual alleged or threatened discharge, dispersal, release or escape of
    pollutants; or
    (2)any direction, request or voluntary decision to test for, abate, monitor, clean up,
    remove, contain, treat, detoxify or neutralize pollutants, nuclear material or
    nuclear waste, including without limitation any Securities Claim or any other
    Claim by or on behalf of the Company or its shareholders in their capacity as
    such.

September 8, 2000, Reliance denied coverage for the Nettles claim.  Id. at ¶50.  On October 30, 2000, Reliance denied coverage for the CCR claim.  Id. at ¶54.  Neither Reliance nor Hartford has ever rendered a coverage position regarding the OCAC claim.  Id. at ¶57-58.

### D.   Related Actions

#### 1.   Pennsylvania Liquidation Proceeding

On October 3, 2001, the Commonwealth Court of Pennsylvania declared Reliance insolvent.  Plaintiffs have agreed not to pursue their claims against Reliance in this coverage action; rather Plaintiffs' claims against Reliance are being pursued in the liquidation proceeding pending before the Commonwealth Court of Pennsylvania.  See Op. in the Matter of G-I Holdings v. Reliance Insurance Co., et al., Civil Action No. 00-6189 (DMC) dated March 23, 2004.  At this time, Plaintiffs' claims against Reliance are still pending before the Pennsylvania Commonwealth Court.

#### 2.   New York Receivership Action

On December 14, 2001, The Honorable Michael D. Stallman of the Supreme Court of the State of New York entered an order directing the Superintendent of Insurance of the State of New York to be appointed as Ancillary Receiver of Reliance.  Judge Stallman further directed the Superintendent "upon authorization of this Court to pay such claims against RIC and/or its policyholders that are covered by the insurance security funds maintained in accordance with Article 76 of the Insurance Law."  See In the Matter of the Application of Gregory v. Serio, as Superintendent of Insurance of the State of New York, for an Order of Appointment as Ancillary Receiver of Reliance Insurance Company, Index No. 405987/01.  Judge Stallman ordered that

> The officers, directors, trustees depositories, policy holders, agents and employees of RIC and all other persons, including but not limited to claimants, plaintiffs and petitioners who have claims against RIC, be and are *hereby enjoined and restrained*

*from bringing or further prosecuting any action at law, suit in equity, special or other proceeding against the said company or estate, the Superintendent and his successors in office,* as Ancillary Receiver thereof, or the New York State Insurance Department-Liquidation Bureau with respect to claims against RIC, or from making or executing any levy upon the property or estate of said company, or the Superintendent as Ancillary Receiver, or the New York State Insurance Department-Liquidation Bureau, *or from in any way interfering with the Superintendent of his successors in office, in his or their possession, control or management of the property of said company*, or in the discharge of his or their duties as Ancillary Receiver thereof, or in the liquidation of the business of said company.

Id. (emphasis added).  Subsequently, on June 9, 2004, Judge Stallman entered an order appointing The Honorable Beatrice Shainwait "to hear and report on any objections filed by claimants to the Ancillary Receiver's recommended claims."  See June 9, 2004 Order of Judge Stallman.

### E.     Procedural History

Plaintiffs originally brought this coverage action under their D&O policies against Reliance and Great American in the Superior Court of New Jersey.  This case was later removed to the District Court.  Plaintiffs dismissed the action in the District Court and filed an amended complaint in the United States Bankruptcy Court.  In the interim, Pennsylvania's Commonwealth Court initiated rehabilitation proceedings against Reliance on May 29, 2001.  Determining that Reliance could not be rehabilitated, the Commonwealth Court placed Reliance into statutory liquidation on October 3, 2001.  The Pennsylvania liquidator moved for an indefinite stay of the New Jersey bankruptcy action as to Reliance.  Great American, the only other defendant in this case at the time, also sought a stay.  In addition to determining that Plaintiffs' action constituted a non-core proceeding, the Bankruptcy Court denied Great American's request for a stay and referred the case back to this Court.  Specifically, the Bankruptcy Court entered an order, denying a stay as to "Other Insurers."  G-I Holdings, Inc. v. Reliance Ins. Co., et al., 278 B.R. 725, 731 (Bankr. D.N.J. 2002).

Plaintiffs subsequently filed another amended complaint in the District Court, adding Hartford as a defendant. Plaintiffs allege that Hartford entered into an asset purchase agreement with Reliance, effective July 1, 2000, to purchase the assets and renewal rights to Reliance's Directors and Officers book of business. Third Am. Compl. at ¶19. Further, Plaintiffs allege that Hartford thereby assumed Reliance's obligations under its policy. Hartford denies that it assumed such obligations and liabilities, taking the position that it took only a limited reinsurance role pursuant to its agreement with Reliance. Plaintiffs later filed a Third Amended Complaint, naming the remaining Defendants, including the Fund.

## II.    DISCUSSION

### A.    12(b)(6) Motion to Dismiss

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), all allegations in the complaint must be taken as true and must be viewed in the light most favorable to the plaintiff. See Warth v. Seldin, 422 U.S. 490, 501 (1975); Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir.1998). In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. See Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court shall dismiss a complaint for failure to state a claim. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

8

**B.**     <u>**Burford**</u> **Abstention Doctrine**

In <u>Burford v. Sun Oil Co.</u>, the Supreme Court recognized that federal courts have equitable

discretion to abstain from cases where they would normally have jurisdiction when there is a need

to defer to complex state administrative procedures.  319 U.S. 315 (1943).  The Court expressed

concern over a "double system of review" resulting in "[d]elay, misunderstanding of local law, and

needless federal conflict with the State policy."  <u>Id.</u> at 327.  Unlike <u>Pullman</u> abstention where a

federal court merely stays an action when it determines abstention is appropriate, pursuant to the

<u>Burford</u> abstention doctrine, a federal court may dismiss an action when deferral to state

administrative procedures is warranted.

<u>Burford</u> abstention is appropriate in two scenarios.  <u>See</u> <u>New Orleans Pub. Serv., Inc. v.</u>

<u>Council of the City of New Orleans "NOPSI"</u>, 491 U.S. 350, 361 (1989); <u>Hi Tech Trans, LLC v.</u>

<u>New Jersey</u>, 382 F.3d 295, 304 (3d Cir. 2004).  A party can secure <u>Burford</u> abstention only:

> (1) when there are "difficult questions of state law bearing on policy problems of
> substantial import whose importance transcends the result in the case then at bar";
> or (2) where the "exercise of federal review of the question in a case and in similar
> cases would be disruptive of state efforts to establish a coherent policy with respect
> to a matter of substantial public concern."

<u>Id.</u> (citing <u>NOPSI</u>, 491 U.S. at 361).  The first prong requires the court to consider "whether timely

and adequate state law review is available."  <u>Hi Tech Trans, LLC</u>, 382 F.3d at 304.  If so, then the

court must determine "if the case before it involves difficult questions of state law impacting on the

state's public policy or whether the district court's exercise of jurisdiction would have a disruptive

effect on the state's efforts to establish a coherent public policy on a matter of important state

concern." <u>Id.</u> (citing <u>Riley v. Simmons</u>, 45 F.3d 764, 771 (3d Cir. 1995).  The second prong requires

the court to examine three issues:

(1) whether the particular regulatory scheme involves a matter of substantial public concern; (2) whether it is the sort of complex technical regulatory scheme to which the Burford abstention doctrine usually is applied; and (3) whether federal review of a party's claim would interfere with the state's efforts to establish and maintain a coherent regulatory policy.

Hi-Tech Trans, LLC, 382 F.3d at 304 (citing Chiropractic Am. v. Lavecchia, 180 F.3d 99, 105 (3d Cir. 1999)).

In this case, the Fund argues that abstention is appropriate under the second prong of Burford. Defendant contends that New York's statutorily established administrative scheme is designed to address the claims of individuals against an insolvent insurance company and the scheme would be disrupted if this Court adjudicated Plaintiffs' claims against the Fund.

## C.      The New York Property/Casualty Insurance Security Fund

The operation of the New York Security Fund is governed by Articles 74 and 76 of the New York Insurance Law §§ 7601-7614 (McKinney 2000 & 2004 Supp.)  The Fund is to be "used in the payment of allowed claims remaining unpaid, in whole or in part, by reason of the inability due to insolvency of an authorized insurer to meet its insurer obligations."  N.Y. Ins. Law, § 7603(a)(1). "Allowed claim" is defined as "a claim which has been allowed by the court in a proceeding under article seventy-four."  N.Y. Ins. Law, § 7602(g).  In other words, only claims that are deemed to be "allowed" pursuant to an article seventy-four proceeding may be paid by the Fund.

The Fund is administered by "the superintendent in accordance with [article seventy-four]." N.Y. Ins. Law, § 7601(e).  The superintendent's role is central to the liquidation of an insurance company.  When a court issues an order directing that an insurer be liquidated, the Superintendent of Insurance, as Ancillary Receiver, or Liquidator, is appointed by the court to take possession of the insurer's assets, and to administer those assets by order of the court.  N.Y. Ins. Law, § 7409(a).  The

day to day business of the insurer is handled by the New York Liquidation Bureau, which processes individual claims against each insurer in liquidation.

The distribution of monies from the Fund is a lengthy process, involving several departments and proceedings as directed by Article 74 of the New York Insurance Law. First, when an insurer is declared insolvent, an ancillary receivership proceeding is commenced. The ancillary receiver then recommends claims to which claimants may object. Next, if a claim is "allowed," as defined by Article 74 of the New York Insurance Law, the claim is filed with the New York Insurance Department's Bureau of Taxes and Accounts. Finally, the Bureau of Taxes and Accounts then forwards a request to the Commissioner of Taxation and Finance to disburse monies from the Fund for transmittal to the Liquidation Bureau, which pays out the individual claims against the liquidated company. See N.Y. Ins. Law § 7608. Distributions from the fund must be performed through the Commission of Taxation and Finance because the Commissioner is responsible for the transfer, disbursement and investment of the Fund's assets.

This scheme is intended to be a "comprehensive, economical, and efficient method for the winding up of the affairs' of [insolvent] insurance companies by the Superintendent of Insurance." The Matter of Knickerbocker Agency, Inc. v. Holz, 4 N.Y. 2d 245, 250 (1958) (citing Motlow v. S. Holding & Sec. Corp., 95 F.2d 721, 724 (8th Cir. 1938)). See also In the Matter of Allcity Ins. Co., 66 A.D.2d 531, 534-35 (1st Dep't. 1979); In the Matter of Union Indem. Ins. Co. of New York, 521 N.Y.S.2d 617, 619 (Sup. Ct., N.Y. Cty. 1987). To preserve this scheme, "New York courts have expressed a strong commitment to preserving the independence of insurance liquidation proceedings from outside interference." Lac D'Amiante Du Quebec, Ltee v. Am. Home Assurance Co. ("LAQ"), 864 F.2d 1033, 1040 (3d Cir. 1988). In fact, the New York Court of Appeals recognized as early as

11

1958 that the Superintendent "was intended to have exclusive jurisdiction of claims both for and against an insurance company in liquidation." Knickerbocker, 4 N.Y.2d at 250.  The Knickerbocker court reasoned that "to secure an economical, efficient, and orderly liquidation and distribution of the assets of an insolvent corporation . . . it is essential that the title, custody, and control of the assets be intrusted to a single management under the supervision of one court." Id. at 252.  Repeatedly and by various courts, "[t]his policy of noninterference has been held necessary for the proceedings to achieve their purpose of protecting the insurer's creditors and the public." LAQ, 864 F.2d at 1040.

Consistent with the premise that the New York liquidation proceedings are independent from outside interference, the Article 74 administrative scheme requires that distributions from the Fund may be made only for "allowed claims."  See N.Y. Ins. Law, § 7602(g).  As stated above, "allowed claims" are claims that have "been allowed by the court in a proceeding under article seventy-four." N.Y. Ins. Law, § 7602(g).  Evident from this definition is the fact that the payment of *any* claim from the Fund necessarily implicates Article 74 proceedings.  Thus, "any payments from the security fund to an insurer in rehabilitation can only be authorized by court order, under the submission of a plan drawn up by the Superintendent."  In the Matter of Allcity, 66 A.D.2d at 537.

## III.   ANALYSIS

### A.   **Burford** Abstention

Neither of the parties contend that this case presents difficult questions of state law.  Thus, abstention is not appropriate under the first Burford prong.  Rather, Defendant argues that abstention is appropriate under the second prong of Burford.  Specifically, Defendant contends that exercise of this Court's jurisdiction over Plaintiffs' claims would disrupt New York's substantial effort to establish a coherent and efficient system for addressing an important public concern: the insolvency

of insurance companies.  As stated above, to determine whether this argument is persuasive, this Court must consider three factors: (1) whether the New York administrative scheme involves a matter of substantial public concern; (2) whether the New York scheme is the type of "complex technical regulatory scheme to which the Burford abstention doctrine usually is applied"; and (3) whether this Court's review of Plaintiffs' claims would interfere with New York's efforts to "establish and maintain a coherent regulatory policy."  Hi Tech Trans, LLC, 382 F.3d at 304.

      1.     Whether the New York Scheme Involves a Matter of Substantial Public Concern

The issue here is whether the insolvency of an insurance company and the resulting liquidation proceedings are a matter of substantial public concern.  Undoubtedly, the insolvency of insurance companies and the administration of claims against the debtor insurer are a matter of substantial public concern.  As the Third Circuit has repeatedly noted,

> the regulation of insurance companies unable to meet their obligations entails the type of strong state interest in which application of Burford abstention is appropriate. Like the valuable natural resource involved in Burford, solvent and healthy insurance coverage is an essential state concern.  The McCarran-Ferguson Act specifically provides that it is in the public interest for states to continue serving their traditional role as the preeminent regulators of insurance in the federal system and indicates the special status of insurance in the realm of state sovereignty.

LAQ, 864 F.2d at 1045; see also Grode v. Mut. Fire, Marine and Inland Ins. Co., 8 F.3d 953, 958 (3d Cir. 1994).  In light of this observation, "the Third Circuit has specifically held that abstention from the exercise of federal jurisdiction over claims arising out of state regulation of insolvent insurance companies is particularly appropriate."  Motor Club of Am. v. Weatherford, 841 F. Supp. 610, 624 (D.N.J. 1994) (citing LAQ, 864 F.2d at 1033; Grode, 8 F.3d at 959; General Glass v. Monsour Med. Found., 973 F.2d 197, 204 (3d Cir. 1992) (overruled on other grounds)).  See also Levy v. Lewis,

635 F.2d 960, 963 (2d Cir. 1980).

> 2.      Whether the New York Scheme Is the Sort of Complex Technical Regulatory
> Scheme to Which the Burford Abstention Doctrine Usually is Applied

Burford abstention is often applied in cases involving state regulation of insurance.  See Levy, 635 F.2d at 963 (citing Smith v. Metro. Prop. and Liab. Ins. Co., 629 F.2d 757 (2d Cir. 1980); Meicler v. Aetna Cas. & Sur. Co., 372 F. Supp. 509 (S.D. Tex. 1974) aff'd, 506 F.2d 732 (5th Cir. 1975); Mathias v. Lennon, 474 F. Supp. 949 (S.D.N.Y. 1979)).  Specifically, several New Jersey courts have "recognized that an injunction issued by a receivership court in another state prohibiting litigation against the receiver or the insolvent insurer should operate to deprive the New Jersey court of jurisdiction."[5]  In addition, Burford abstention has been applied in numerous other cases involving the same administrative regulatory scheme at issue here.[6]  Courts have repeatedly recognized that New York's administrative scheme is intricate in its design because it is intended to be both insular and comprehensive.[7]

Additionally, in finding Burford abstention to be appropriate, courts have often cited the

---

[5]Glushakow v. Confederation Life Ins. Co., No. 94-4201, 1994 WL 803204, *3 (D.N.J. Dec. 5, 1994) (citing Superintendent of Ins. of State of N.Y. v. Int'l Equip. Leasing, Inc., 247 N.J. Super. 119, 127-129 (App. Div.), certif. denied, 126 N.J. 389 (1991); Murphy v. Ambassador Ins. Co., 195 N.J. Super. 274, 284 (Ch. Div. 1984); Zullo Lumber v. King Constr., 146 N.J. Super. 88, 93-94 (Law Div. 1976)). See also LAQ, 864 F.2d 1033; Ballesteros v. New Jersey Prop. Liab. Ins. Guar. Fund, 530 F. Supp. 1367 (D.N.J.), aff'd by, 696 F.2d 980 (3d Cir. 1982).

[6]  LAQ, 864 F.2d 1033; Law Enforcement Ins. Co., Ltd., v. Corcoran, 807 F.2d 38 (2d Cir. 1986) cert. denied, 481 U.S. 1017 (1987); Corcoran v. Ardra Ins. Co., 657 F. Supp. 1223 (S.D.N.Y. 1987); Corcoran v. Universal Reinsurance Corp., 713 F. Supp. 77 (S.D.N.Y. 1989).

[7].  See LAQ, 864 F.2d at 1040; Levy, 635 F.2d at 963;  Knickerbocker, 4 N.Y. 2d at 250; In the Matter of Allcity Ins. Co., 66 A.D.2d at 534-35; In the Matter of Union Indem. Ins. Co. of New York, 521 N.Y.S. 2d at 619.

McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, as evidence of a strong public policy of noninterference in insurance matters.  For example, the Levy court also noted that the New York scheme has "been adopted pursuant to congressional authorization.."  635 F.2d at 963 (citing McCarran-Ferguson Act, 15 U.S.C. §§ 1011-15).  As such, "[f]ederal courts have therefore been slow to interrupt such schemes unless necessary, particularly when federal court action would impinge upon the area in which Congress has recognized the overriding interest of the States."  Id. at 963-64.  See also LAQ, 864 F.2d at 1045; Grode, 8 F.3d at 958; Glushakow, No. 94-4201, 1994 WL 803204 at *7.  Thus, if this Court exercised jurisdiction over Plaintiffs' claims against the Fund, the Court would be acting in violation of a strong federal policy of non-interference, impinging upon an area in which New York has an overriding interest.

Defendant also cites the Uniform Insurers Liquidation Act, N.J.S.A. 17:30C-1, et. seq., stating that it "was passed with the understanding that the liquidation and the rehabilitation of an insurance carrier may have consequences in more than one state." Def.'s Br. at 8.  See e.g., N.J.S.A. 17:30C-18 and 19.  Defendant argues that the policies underlying this statute require that New Jersey proceedings "must give effect to the Supreme Court of the State of New York's injunction."  Int'l Equip. Leasing, 247 N.J. Super. at 129.  For example, in Glushakow, the district court ruled that it should defer to Michigan rehabilitation proceedings because the courts of New Jersey would have done so on similar facts. No. 94-4201, 1994 WL 803204, *13.  Review of the Uniform Insurers Liquidation Act, adopted by both New Jersey, N.J.S.A. 17:30C-1, et seq., and New York, N.Y. Ins. Law § 7401 et seq., indicates that both of these states "expressly recognized that the orderly liquidation and distribution of assets of an insolvent insurance company requires centralized management of the delinquency proceeding in one state.  Int'l Equip. Leasing, 247 N.J. Super. at

123-24 (citing <u>Murphy</u>, 195 N.J. Super. at 281).  This court will defer to New York and New Jersey's well-established policy of noninterference in other states' liquidation proceedings of insolvent insurers.

Plaintiffs seek to distinguish all the cases cited by the Defendant on the ground that each case "discusses only whether the court should abstain from hearing claims against an insolvent insurer." Pl.'s Opp'n Br. at 17.  Plaintiffs devote paragraphs to this point, attempting to persuade this Court to recognize a brightline rule that has not been recognized by this district or the Third Circuit; namely, that where "the insolvent insurer is not a party to the action, a federal court *cannot* grant <u>Burford</u> abstention."  Pl.'s Opp'n Br. at 19 (emphasis in original).  To support this point, Plaintiffs misleadingly cite <u>Glukashow</u>, pointing to language that states "[o]nly when the insurer is itself a party and the claims asserted are derivative of those belonging to the insolvent entity will this interference [warranting abstention] be found."  No. 94-4201, 1994 WL 803204, *9.  However, Plaintiff disregards that this same court held that there is "no *per se* rule of abstention" and that federal courts must be more primarily concerned with whether "resolving the claims will not directly interfere with the purposes behind the rehabilitation or liquidation action and involve questions of state law that effect the state-imposed regime."  <u>Id.</u>  <u>See also</u> <u>LAQ</u>, 864 F.2d at 1047; <u>General Glass</u>, 973 F.2d at 201 (both holding that there is no per se rule of abstention.)

Additionally, Plaintiffs misleadingly cite a Third Circuit case in support of the point that abstention is only appropriate when an insolvent insurer is a party to the action.  Pl. Opp'n Br. at 20 (citing <u>Univ. of Maryland at Baltimore v. Peat Marwick Main & Co.</u>, 923 F.2d 265, 274 (3d Cir. 1991)).  A review of <u>Peat Marwick</u> reveals that the Third Circuit made clear that "<u>Burford</u> abstention may be ordered in insurer insolvency cases only when one of the parties to the action in which the

16

federal court abstains is the insolvent insurer *or its receiver*, trustee, officers and the like." Id. at 271. In this case, the Superintendent has been appointed as ancillary receiver of Reliance pursuant to New York Insurance Law § 7409(a). Thus, as the receiver of Reliance, the Superintendent unquestionably falls within one of the categories delineated by Peat Marwick.[8] Further, Peat Marwick is factually distinguishable from the case at hand: there, the policyholder plaintiffs brought suit against an independent auditor of the insurer's books, *not* the state insurance fund or superintendent, as is the case here. Contrary to Plaintiffs' misleading argument, the Third Circuit has not found that abstention is appropriate only when the insolvent insurer remains a party to the action. Rather, the Third Circuit has expressed concern over a "third party's connection to the state regulatory mechanism (governing insolvency proceedings) that Burford abstention is designed to protect, is simply too attenuated to justify renunciation of a federal court's obligation to exercise the jurisdiction granted to it by Congress." Id. In this case, the Fund's connection to the state regulatory mechanism is certainly not too attenuated but rather, it is a component of the regulatory system itself.

This Court is unpersuaded by Plaintiffs' argument that abstention is appropriate only when an insolvent insurer is a party. Burford abstention does not hinge upon the identities of the parties; but rather, is a question of whether the federal court should exercise jurisdiction over claims that will result in "[d]elay, misunderstanding of local law, and needless federal conflict with the State policy." 319 U.S. at 327. In this case, Plaintiffs are asking this Court to decide whether claims are "allowed" under New York Insurance Law §§ 7602 and 7603, such that they are payable by the Fund. This is

---

[8] While the currently named Defendant, the New York Property/Casualty Insurance Security Fund is not acting as the ancillary receiver, Plaintiffs concede that the New York Insurance Superintendent is the properly named party to this action, who, pursuant to Judge Stallman's December 14, 2001 Order is acting as the ancillary receiver of Reliance.

the very same issue to be decided by the Superintendent.  If this Court were to exercise its jurisdiction over Plaintiffs' claims against the Fund and decide this issue, the Court would necessarily be applying local law, with the risk of misunderstanding it and also potentially engaging in a "double system of review."  Burford, 319 U.S. at 327.  Not only would adjudication of Plaintiffs' claims conflict with New York's state policy of maintaining an independent and insular administrative system to address insurer insolvencies, but also would conflict with federal policy of noninterference in insurance matters.

3.    Whether Federal Review of a Party's Claim Would Interfere With New York's Efforts to Establish and Maintain a Coherent Regulatory Policy

New York courts as well as federal courts have recognized that New York has made strong efforts to ensure that the state's liquidation proceedings remain independent from outside interference.  See Knickerbocker, 4 N.Y. 2d 250;  LAQ, 864 F.2d at 1040.  Further evidence of this point is that New York has adopted the Uniform Insurers Liquidation Act.  N.Y. Ins. Law § 7401, et seq.  New York has recognized the value in a coherent administrative system to address the issues involved in the event of insurer insolvency and made substantial efforts to maintain a system that operates independently from outside influence.  See Id.

Defendant argues that the "liquidation process could be greatly impeded by subjecting it to two different authorities, which in turn could give rise to inconsistent results."  Def.'s Br. at 7.  This argument is sound, especially in light of the fact that "[t]he experience of our own federal bankruptcy courts evidences the importance of consolidating all of the assets of an insolvent company and gathering all those who have claims against those assets in a single forum."  Levy, 635 F.2d at 964.  Additionally, as stated above, abstention is particularly appropriate where this Court is being asked

18

to decide the same issues before the Superintendent regarding the payment of "allowed claims."

Plaintiff argues that if this Court orders payments of Plaintiffs' underlying claims the "outcome will impact neither on Reliance's assets nor the disposition of the liquidation."  However, Defendants persuasively rebut this argument, emphasizing that the Court's adjudication of Plaintiffs' claims would disrupt the New York court's important jurisdictional role authorizing *only* the Superintendent to pay "allowed claims" from the Fund pursuant to Articles 74 and 76.

In sum, adjudication of Plaintiffs' claims in their favor would require this Court to order the Fund to make payments to Plaintiffs, as policy holders, on claims under the Reliance policy.  Taking such an action would directly interfere with the complex New York administrative scheme established to resolve claims against insolvent insurance companies.  Not only are such claims within the exclusive jurisdiction of the New York court overseeing the receivership action, but also, payments from the Fund are to be made only on "allowed claims."  Claims are "allowed" only if they are recognized as such pursuant to Article 74 procedures.  Granting Plaintiffs' requested relief in this case would force payment of claims that have not been approved by the Superintendent and also claims that have not been deemed "allowed" pursuant to the Article 74 procedures.  Such an action would unquestionably intrude upon both the New York court's jurisdiction and also upset the administrative scheme's complex and intricate procedures.

### B.     "Law of the Case" Doctrine

Not only do Plaintiffs oppose application of the <u>Burford</u> abstention doctrine in this case, but they also argue that the "law of the case" doctrine is applicable to bar Defendant's motion to dismiss. Generally, the "law of the case" doctrine prevents relitigation of the same issues in the same suit. <u>See</u> Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 165 (3d Cir. 1982); <u>Baker v. Nat'l State</u>

19

Bank, 353 N.J. Super. 145, 170 (App. Div. 2002).  In this case, Plaintiffs argue that the "law of the case" doctrine precludes disposition of Defendant's motion in favor of the Fund because it asks this Court to decide the same issue previously decided by the Bankruptcy Court in its May 21, 2002 order, denying a stay to all other insurers other than Reliance.  This argument is unpersuasive for several reasons.

First and foremost, the "law of the case" doctrine is a "flexible" doctrine, "calling for 'good sense' application."  Higgins v. Swiecicki, 315 N.J. Super. 488, 492 (App. Div. 1998) (citing Hart v. City of Jersey City, 308 N.J. Super. 487, 489 (App. Div. 1998)).  Thus, even if adjudication of Defendant's motion would constitute relitigation of an issue already decided by the Bankruptcy Court, this Court may take into consideration other concerns in order to apply the "law of the case" doctrine sensibly.  Second, the Fund was not a party to this action at the time of the Bankruptcy Court's May 21, 2002 Order and, thus, the order did not apply to the Fund.  Finally, the issue addressed by the Bankruptcy Court in its May 21, 2002 Order is distinct from the issue here.  The Bankruptcy Court was asked to determine whether a stay was appropriate as to solvent insurers. Here, the Court must determine whether to abstain from deciding if the Fund is liable to Plaintiffs under the relevant New York statutes.  Because this Court is not being asked to adjudicate the same issue already decided by the Bankruptcy Court, the "law of the case" doctrine is not violated and it is not grounds for denying the Fund's motion.

## IV.   CONCLUSION

For the reasons stated, it is the finding of this Court that Defendant's motion to dismiss is **granted** and Plaintiffs' motion to amend the Complaint is **denied**.   An appropriate Order accompanies this Opinion.

  S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:          December   22  , 2006

Orig.:      Clerk
cc:         Counsel of Record
            The Honorable Mark Falk, U.S.M.J.
            File