NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| G-I HOLDINGS AND SAMUEL J. HEYMAN, | : | **Hon. Dennis M. Cavanaugh** |
| Plaintiffs, | : : : | **OPINION** |
| v. | : : | Civil Action No. 00-6189 (DMC) |
| HARTFORD FIRE INSURANCE COMPANY, TWIN CITY FIRE INSURANCE COMPANY, | : : : : | |
| Defendants. | : : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motions for summary judgment filed by Defendants Hartford Fire Insurance Company ("Hartford") and Twin City Fire Insurance Company ("Twin City") (collectively "Defendants") and by Plaintiffs G-I Holdings ("G-I") and Samuel J. Heyman ("Heyman") (collectively "Plaintiffs") pursuant to Federal Rule of Civil Procedure 56. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, no oral argument was heard. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that Defendants' motions for summary judgment are **granted** and Plaintiffs' motions for summary judgment are **denied**.

## I.   BACKGROUND

This is a coverage action brought by Plaintiffs for losses sustained in defending three fraudulent conveyance actions. Plaintiffs originally brought suit against Reliance Insurance

Company ("Reliance"), their primary insurer and Great American Insurance Company ("Great American"), their umbrella insurer, pursuant to directors and officers ("D&O") policies. Reliance has since become bankrupt. Plaintiffs subsequently joined Hartford and Twin City alleging that Defendants purchased the assets and renewal rights to Reliance's D&O book of business and seeking coverage pursuant to Plaintiffs' D&O policy with Reliance and pursuant to Plaintiffs' D&O policy with Defendants.

### A.    Previous Asbestos Litigations

Beginning in the late 1970s, numerous actions were filed against GAF (the predecessor in interest to G-I), alleging bodily injury as a result of exposure to GAF's asbestos containing products and byproducts. In September of 1988, GAF and a group of other asbestos defendants formed the Center for Claims Resolution, Inc. ("CCR"), a non-profit corporation created to administer and arrange for the evaluation, settlement, payment or defense of asbestos related claims against its members. In 1993, CCR negotiated a settlement with representatives of a proposed class consisting of future asbestos claimants. While the proposed settlement was initially approved by the United States District Court for the District of Eastern Pennsylvania in a decision captioned Carlough v. Amchem Products, Inc., the Third Circuit subsequently vacated the settlement. The Third Circuit's decision was affirmed by the Supreme Court. See Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997).

By 1996, GAF was facing asbestos liability estimated to be approximately $213.8 million for existing claims, with the prospect of hundreds of thousands more such claims to be asserted in the future. GAF terminated its membership in the CCR on January 17, 2000. At that time GAF's liabilities totaled approximately $309.2 million. Additionally, CCR alleges that as of January 1,

1997, GAF was obligated to the CCR in the amount of $68.3 million for its share of defense costs and indemnity payments.

Until January 1, 1997, GAF held 100% of the stock in ISP Holdings, Inc. ("ISPH"). ISPH owned 83.5% of the stock in ISP. Effective January 1, 1997, GAF made a transfer by distribution of 100% of GAF's ISPH shares to GAF's shareholders. Heyman was the majority shareholder of GAF and during all relevant times to this action Heyman served as the chief executive officer, controlling shareholder and chairman of the board of directors for GAF as well as the same for ISP. ISP then merged with ISPH and changed its name to International Specialty Products, Inc. ("ISPI"). Heyman then transferred a substantial part of his ISPI stock to his own companies.

During October and November of 2000, GAF and other newly created corporate subsidiaries were collapsed into a single entity, re-named as G-I Holdings. G-I filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of New Jersey on January 5, 2001.

### B.      Underlying Fraudulent Conveyance Actions

Three lawsuits have been commenced against Plaintiffs, all alleging that the 1997 transfers constituted a fraudulent conveyance under New York law. A putative class action was filed by Harry W. Nettles in the United States District Court for the Southern District of New York on January 3, 2000 ("Nettles claim"). Third Am. Compl. at ¶¶26-33. That same year, CCR filed an action on September 19, 2000 ("CCR action"). Id. at ¶¶34-38. Approximately a year later, on September 17, 2001, the Official Committee of Asbestos Claimants of G-I in the Chapter 11 bankruptcy proceedings filed an action against Plaintiffs ( "OCAC action"). Id. at ¶¶39-43. The complaints in each of these actions allege that Plaintiffs transferred GAF shares to ISPH, in an effort to place these shares beyond the reach of GAF's creditors. It is alleged that no consideration was paid to GAF for

the transfer of ISPH's stock.  Based on these allegations, the plaintiffs in the underlying actions sought compensatory damages, equitable relief and punitive damages.

Plaintiffs gave Reliance notice of the Nettles, CCR and OCAC on April 11, 2000, October 6, 2000 and October 12, 2001 respectively. Id. at ¶¶44-56.  On September 8, 2000, Reliance denied coverage for the Nettles claim.  Id. at ¶50.  On October 30, 2000, Reliance denied coverage for the CCR claim.  Id. at ¶54.  Reliance never rendered a coverage position regarding the OCAC claim. Id. at ¶57-58.

### C.   Reliance Insurance Agreement

Plaintiffs purchased from Reliance a primary D&O insurance policy, number NDA 0152124-99B, effective July 1, 1999 to July 1, 2002 ("the Reliance Policy").  Id. at ¶13.  The Reliance Policy provides coverage for certain "wrongful acts."   Claims under the policy must be first made and reported no later than sixty days after the termination of the policy.  Further, the Reliance D&O policy provides coverage to G-I to the extent it indemnifies Heyman for covered claims and also provides direct coverage to Heyman for covered claims.  The Reliance policy provides "company reimbursement" coverage above a $250,000 self-insured retention, which retention exhausts through indemnity and defense costs paid by plaintiffs.  If G-I refuses to indemnify Heyman then the Reliance Policy's direct coverage to Heyman applies above the $250,000 retention unless G-I refuses to indemnify for reasons of "Financial Insolvency."

The Reliance Policy was written on a "claims made basis" and affords insurance to directors, officers and GAF for any "wrongful act which takes place during or prior to the policy period."  The policy further states that "[a]ll claims arising out of the same Wrongful Act or Interrelated Wrongful Act of one or more of the Insureds shall be considered a single claim."  Id. at ¶16.

-4-

1.      Cancellation of Reliance Policy & Inception of Hartford/Twin City Policy[1]

The undisputed evidence shows that GAF's Risk Manager, Robert Flugger, became concerned about the financial condition of Reliance during the summer of 2000. See Certification of Celestine M. Montague in Support of Hartford and Twin City's Motion for Summary Judgment as to Plaintiffs' Claims Under the Reliance Policy ("Montague Reliance Cert.") Ex. G, Excerpts of Deposition Transcript of Robert Flugger ("Flugger Tr.") at pp. 51, 53-55. As a result of these concerns, GAF cancelled its D&O policy with Reliance, effective as of July 1, 2000 and purchased a new policy from Hartford/Twin City for the remainder of time that Reliance was supposed to be on the risk. Montague Reliance Cert., Ex. G, Flugger Tr. at pp. 61, 63, 65-67. The Hartford/Twin City Policy was issued effective July 15, 2000, providing similar D&O coverage for claims first made and reported during the policy period running from July 15, 2000 to July 1, 2002. Third Am. Compl, ¶14. The relevant provisions of the Hartford/Twin City Policy are discussed in more detail below.

2.      Insolvency Proceedings Against Reliance

On October 3, 2001, the Commonwealth Court of Pennsylvania declared Reliance insolvent, placing it in statutory rehabilitation. Plaintiffs have agreed not to pursue their claims against Reliance in this coverage action; rather, Plaintiffs' claims against Reliance are being pursued in the liquidation proceeding pending before the Commonwealth Court of Pennsylvania. See Op. in the Matter of G-I Holdings v. Reliance Insurance Co., et al., Civil Action No. 00-6189 (DMC) dated

_____

[1] As stated in the Third Amended Complaint, Twin City is "a member of, and is wholly-owned by, the Hartford Insurance Group." Third Amended Compl. ¶5. In their moving papers, Plaintiffs routinely refer to the Defendants as "Hartford," while Defendants refer to their policy with Plaintiffs as the Twin City Policy. To avoid confusion, this policy is hereinafter referred to as the "Hartford/Twin City Policy."

March 23, 2004.

     **D.    Hartford-Reliance Asset Purchase Agreement, Reinsurance Agreement and Claims Servicing Agreements**

Hartford entered into an asset purchase agreement ("APA") with Reliance, effective July 1, 2000, to purchase the assets and renewal rights to Reliance's Directors and Officers book of business. As part of the APA, Reliance and Hartford entered into three other agreements: a "Quota Share Reinsurance Agreement" (the "Reinsurance Agreement") and two Claims Servicing Agreements.

Pursuant to the Reinsurance Agreement, Hartford agreed to reinsure Reliance for certain specifically defined risks. The obligation to reinsure Reliance for these specifically defined risks arose once Reliance made payment for such risks. See Certification of Nicole Corona, dated June 30, 2006 ("Corona Cert.", Ex. Z, Reinsurance Agreement. Specifically, the Reinsurance Agreement provides:

> The Ceding Company [Reliance] cedes and the Reinsurer [Hartford Fire Insurance Company] hereby accepts one hundred percent (100%) of the Ceding Company's Net Liability (as defined above) for Ultimate Net Loss relating under the In-Force Policies made on or after the Effective Time.

Id. at 3. Further, "Ultimate Net Loss" is defined as

> that amount of Losses, Allocated Loss Expense, Extracontractual Obligations and Losses Excess of Policy Limits that the Ceding Company has paid, after deduction of salvage and subrogation.

Id. Reliance facilitated Hartford's assumption of its D&O obligations by transferring to Hartford, in or about July 2000, "all of the books and records (including all hard copies and electronic or other copies thereof)" relating to Reliance's D&O's business.

Additionally, the APA provided that Hartford would act as Reliance's third-party

administrator to manage certain claims pursuant to two Claims Servicing Agreements.  However, Reliance retained the authority for coverage determinations as well as responsibility for funding claims.  Specifically, Paragraph 1.2 of the APA (entitled "Limited Assumption of Liabilities") states that except for its obligations under the Reinsurance Agreement and certain other liabilities accruing after the closing of the APA, Hartford:

> shall not assume any liabilities of Holdings or any of the Reliance Companies of any nature whatsoever, whether absolute, contingent, or otherwise by reason of this Agreement or the transactions contemplated hereby

Montague Reliance Cert., Ex. H, APA, p. 2.  The first claims servicing agreement, the "Pre-July 1 Claims Agreement" (Montague Reliance Cert., Ex. K) required Hartford to manage claims in existence as of June 30, 2000 and prior.  The second claims servicing agreement, the "Post-July 1 Claims Agreement" (Montague Reliance Cert., Ex. L) required Hartford to manage claims from July 1, 2000 going forward.

### E.  Hartford/Twin City Policy

As stated above, Hartford/Twin City issued a policy to GAF with a defined policy period of July 15, 2000 to July 1, 2002.  This policy is very similar to the Reliance D&O policy and contains many of the same exclusions and limitations on coverage.

#### 1.  Claims "First Made" or "Interrelated Wrongful Acts" Provision

Like the Reliance Policy, the Hartford/Twin City Policy is a "claims made and reported" "Directors, Officers and Company Liability Policy" that provided coverage for certain "wrongful acts" when the claims were first made and reported while the policy is in force and which were reported to Defendants no later than sixty days after the termination of the policy.  Further, the Hartford/Twin City D&O policy contains an "interrelated wrongful act" clause, stating:

> All Claims arising out of the same Wrongful Act or Interrelated Wrongful Acts of one or more of the Insureds shall be considered a single Claim. Such Claims shall be deemed to be first made on the date the first such Claim is made or deemed to be made pursuant to Section VIII.(A) of this Policy, regardless of whether such date is before or during the Policy Period.

Montague Reliance Cert., Ex. A, Twin City Policy at HART-000007. The Policy's Notice provision

further provides that

> If, during the Policy Period the Insureds become aware of a specific Wrongful Act that may reasonably be expected to give rise to a Claim against any Director or Officer . . . and if such Wrongful Act is reported to the Insurer during the Policy Period in writing with particulars . . . then any Claim subsequently arising from such duly reported Wrongful Act shall be deemed under this Policy to be a Claim made during the Policy Period in which the Wrongful Act is first duly reported to the Insurer.

Montague Reliance Cert., Ex. A, Twin City Policy at HART-000008. Contained within the

definition of "claim" is "a civil proceeding commenced by the service of a complaint or similar

pleading." Further, a "wrongful act" is defined in pertinent part as:

> (1) an actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, committed or attempted by the Directors and Officers, in their capacity as such, or in an Outside Position

Montague Reliance Cert., Ex. A., Twin City Policy at HART-000005.

The Hartford/Twin City Policy has two coverage parts: Coverage "A" and Coverage "B."

The Insuring Agreement for Coverage "A," Directors' and Officers Liability Coverage provides:

> Except for Loss which the Insurer pays pursuant to Insuring Agreement (B) of this Policy, the Insurer will pay on behalf of the Directors and Officers Loss which the Directors and Officers shall become legally obligated to pay as a result of a Claim first made during the Policy Period . . . against the Directors and Officers for a Wrongful Act which takes place during or prior to the Policy Period.

Montague Reliance Cert., Ex. A. The Insuring Agreement for Coverage "B," Company

Reimbursement Coverage provides,

-8-

> The Insurer will pay on behalf of the Company Loss for which the Company has, to the extent permitted or required by law, indemnified the Directors and Officers, and which the Directors and Officers have become legally obligated to pay as a result of a Claim first made during the Policy Period . . . against the Directors and Officers for a Wrongful Act which takes place during or prior to the Policy Period.

Id.  Additionally, the Declaration page of the Twin City Policy states:

> NOTICE: THIS IS A CLAIMS-MADE AND REPORTED POLICY.  EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR WRONGFUL ACTS FOR WHICH CLAIMS ARE FIRST MADE WHILE THE POLICY IS IN FORCE.

Id.  Based on the foregoing provisions, Defendants claim that they are not obligated to provide coverage on Plaintiffs' claims because they are claims "first made" before the inception of the Hartford/Twin City policy.

## II.    PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint against Reliance and Great American, their excess insurer, in the Superior Court of New Jersey, Law Division, Middlesex County on November 13, 2000.  The original Defendants removed the case to this Court.  When this case was first removed from the Superior Court of New Jersey,  Plaintiffs dismissed the action in the District Court and filed an amended complaint in the United States Bankruptcy Court.  On May 31, 2002, the Bankruptcy Court determined that Plaintiffs' action constituted a non-core proceeding, denied Great American's request for a stay and also referred the case back to this Court.  Plaintiffs subsequently filed another amended complaint in the District Court, adding Hartford/Twin City as a defendant.

On November 8, 2002, Plaintiffs filed a motion for summary judgment and Hartford filed a motion to dismiss Plaintiffs' First Amended Complaint.  Additionally, Great American sought dismissal of the action against it, pending resolution of the coverage dispute between Reliance and

Plaintiffs.  This Court dismissed the action against Great American without prejudice finding that no justiciable controversy existed until the time Plaintiffs exhausted their rights under the Reliance Policy.  See Op. in the Matter of G-I Holdings v. Reliance Insurance Co., et al., Civil Action No. 00-6189 (DMC) dated March 23, 2004.  However, the Court denied Hartford's and Plaintiffs' motions for summary judgment.

Pending before the Court now are Plaintiffs' and Defendants' motions for summary judgment, all filed on June 30, 3006.  Defendants Hartford and Twin City filed two motions: one motion for summary judgment as to Plaintiffs' claims under the Hartford/Twin City policy and another motion for summary judgment as to Plaintiffs' claims under the Reliance policy.  Plaintiffs also filed two motions: one motion for summary judgment on the inapplicability of policy exclusions and another motion for summary judgment on the inapplicability of Hartford's "interrelated wrongful act" provision.  These motions involve the same core issues: (1) the applicability of the "interrelated wrongful act" provision contained in the Hartford/Twin City Policy; (2) whether Defendants' purchase of Reliance's D&O book of business gives Plaintiffs the right to obtain coverage from Defendants pursuant to the Reliance Policy; and (3) the applicability of the CGL and Pollution Exclusions in the Reliance and Hartford/Twin City Policies.  In light of the interrelated nature of these motions, this Court will rule on these motions in a single opinion.

## III.   STANDARD OF REVIEW: RULE 56 SUMMARY JUDGMENT

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  The moving party bears the burden of showing that there

is no genuine issue of fact.  <u>Id.</u>  "The burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party."  <u>Id.</u>  The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. Fed. R. Civ. P. 56(e); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

## IV.  DISCUSSION

### A.    Choice of Law

Both the Reliance Policy and the Hartford/Twin City Policy contain choice of law provisions, stating that New Jersey law should be applied.  See Corona Cert., Ex. A. and B (Endorsement No. 8 of both policies).  Thus, this Court will apply New Jersey law to determine whether Defendants are liable as to Plaintiffs' Claims under the respective policies.

### B.    Interpretation of Insurance Policy

According to "well-established principles of insurance law . . . 'the insured has the burden to bring claims within the basic terms of the policy.' "  F.S. v. L.D., 362 N.J. Super. 161, 165-66 (App. Div. 2003) (citing <u>Sears Roebuck and Co. v. Nat'l Union Fire Ins. Co.</u>, 340 N.J. Super. 223, 234 (App Div.) <u>certif. denied</u>, 169 N.J. 608 (2001)).  Nevertheless, if there is a question as to whether an exclusion in the policy applies, the burden is on the insurer to prove the applicability of the exclusion.  <u>See</u> Gibson v. Callaghan, 158 N.J. 662, 671 (1999); Am. Motorists Ins. Co. v. L-C-A-Sales Co., 155 N.J. 29, 41 (1998); Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 95 (1997) (all holding that the burden is on the insurer to bring the case within the exclusion).

In determining whether the insured's claims fall within the basic terms of the policy, the

words of the insurance policy are to be given their plain meaning.  Benjamin Moore & Co. v. Aetna Cas. & Surety Co., 179 N.J. 87, 102 (2004) (citing *inter alia*, Lee R. Russ and Thomas F. Segalla, Couch on Insurance 3D § 22:38 (1997)).  However, if there is a doubt "regarding the existence of coverage, that doubt is ordinarily to be resolved in favor of the insured." Id. (citing Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437 (1994)).  It is important to emphasize that only when there are ambiguities should the doubt be "resolved in favor of the insured" because, as the New Jersey Supreme Court has stated, courts "should not write for the insured a better policy of insurance than the one purchased."  Bd. of Educ. of the Borough of Florham Park v. Utica Mut. Ins. Co., 172 N.J. 300, 307 (2002) (citing Gibson, 158 N.J. at 670).

## V.    ANALYSIS

### A.    Defendants' Liability As To Plaintiffs' Claims Under the Hartford/Twin City Policy

Plaintiffs seek coverage from Defendants under the Hartford/Twin City for claims based on the underlying fraudulent conveyance actions.  Specifically, Plaintiffs argue that the CCR and OCAC actions fall within Hartford/Twin City's D&O policy; and thus, Defendants are obligated to provide coverage for these claims.

#### 1.    Applicability of Claims "First Made" Provision and "Interrelated Wrongful Acts" Provision

The Hartford/Twin City policy, like the Reliance policy, is a "claims made" policy. Montague Reliance Cert., Ex. A, Twin City Policy at HART-000001-000002.  Under a "claims-made" policy, the event that invokes coverage is "transmittal of notice of the claim to the insurance carrier."  Zuckerman v. Nat'l Union Fire Ins. Co., 100 N.J. 304, 324 (1985); see also Insite-Props., Inc. v. Jay Phillips, Inc., 271 N.J. Super. 380, 384 (App Div. 1994).  In this regard, the terms and

notice period of a "claims-made" policy are to be strictly enforced because:

> [i]n exchange for limiting coverage only to claims made during the policy period, the carrier provides the insured with retroactive coverage for errors and omissions that took place prior to the policy period.  Thus, an extension of a notice period in a "claims made" policy constitutes an unbargained-for expansion of coverage *gratis*, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy.

Zuckerman, 100 N.J. at 324.  Here, under the "first made" provision in the Hartford/Twin City Policy, Defendants are obligated to provide coverage for Plaintiffs' claims only if the claims were "first made" during the policy period of July 15, 2000 to July 1, 2002.

The undisputed facts show that the Nettles Complaint was filed on January 3, 2000, six months before the Hartford/Twin City Policy was incepted on July 15, 2000.  Pursuant to Hartford/Twin City's "Interrelated Wrongful Acts" provision, subsequent suits that arise out of the same wrongful act - here, the alleged fraudulent transfers - are deemed to be filed on the same date. In other words, once a claim is made, any subsequently filed lawsuits that arise out of the same or interrelated wrongful conduct relate back to the date on which the claim is made.  Thus, if the CCR and OCAC actions arose from the same wrongful act or conduct, they "relate back" to the Nettles claim and are deemed to be "claims made" on January 3, 2000 - the date the Nettles action was filed.

Here, the record shows that the underlying lawsuits - the Nettles, CCR and OCAC actions - arise out of the same acts.  Specifically, the underlying actions were all brought as a result of Heyman's transfer of ISP stock that allegedly shielded hundreds of millions of dollars from asbestos claimants.  The interrelated nature of the underlying lawsuits is evident simply from looking at the complaints filed in the Nettles, CCR and OCAC actions: they cite the same facts and figures and make the same allegations.  See Defs. Br. in Support of Motion for Summary Judgment as to

-13-

Plaintiffs' Claims Under the Twin City Policy at 11-13.  Specifically, all three complaints allege *inter alia* that (1) Plaintiffs transferred GAF's shares to ISP on January 1, 1997; (2) the transfer was made without consideration; (3) in the 1970s, claimants began to assert claims seeking compensation for injuries allegedly inflicted by asbestos and products containing asbestos; (4) approximately 59,400 of these suits were pending against GAF as of December 31, 2006; and (5) the stock transfer was made with actual intent to hinder, delay or defraud present and future creditors of GAF.  See Nettles Compl. ¶¶4, 21, 22, 59 ; CCR Compl. ¶¶22, 24, 15, 16, 51 ; OCAC Compl. ¶¶3, 5, 30, 45, 84.   In fact, Plaintiffs' Complaint concedes this point, stating that the Nettles, CCR and OCAC actions all "arise[s] out of a series of transactions allegedly effected on January 1, 1997 by G-I and Heyman."  Third Amended Compl. ¶¶27, 35, 40.

Plaintiffs correctly note that exclusionary clauses, like the "interrelated wrongful acts" provision at issue here, are to be strictly construed against the insurer.  See Ruvolo v. Am. Cas. Co., 39 N.J. 490, 498 (1963); Deodato v. Hartford Ins. Co., 143 N.J. Super. 396, 401 (Law Div. 1976), aff'd 154 N.J. Super. 263 (App. Div. 1977).   Bearing in mind this canon of construction, it is nevertheless the finding of this Court that Hartford satisfies its burden of proving the applicability of the "interrelated wrongful acts" provision. The "interrelated wrongful acts" provision is clear and unambiguous.  See Am. Motorists Ins. Co., 155 N.J. at  41 (holding that where language of the exclusion is unambiguous, insurer satisfied burden of showing exclusion applied).  Further, the situation it describes - where different claims arise from the same act or acts of the insured - is clearly applicable to the facts of this case.

Because the CCR and OCAC claims relate back to the date on which the Nettles claim was filed, they do not constitute claims "first made" during the Hartford/Twin City Policy period.

Accord Seneca Ins. Co. v. Kemper Ins. Co., No. 02 Civ. 10088, 2004 WL 1145830, *8-9 (S.D.N.Y. May 20 2004) (holding that "first made" provision unambiguously applied to claims, although filed by different plaintiffs, because both complained that similar conduct on the part of the insured violated antitrust law); Anglo-Am. Ins. Co. v. Molin, 547 Pa. 504, 514-15 (1997) (reversing injunction requiring insurer to pay legal fees given plausibility that acts were "interrelated" with those alleged in earlier lawsuit).

In fact, Plaintiffs' own expert acknowledged that each of the underlying complaints arise out of and allege the same act so as to be treated as one claim first made under the preceding D&O Policy.  See Defs. Br. in Support of Motion for Summary Judgment as to Plaintiffs' Claims Under the Twin City Policy at 10 (citing Excerpts of Deposition Transcript of Donald Bendure ("Bendure Tr.") (Montague Reliance Cert., Ex. O) at pp. 49-50).  Also consistent with Hartford/Twin City's position, Reliance treated the underlying suits as a single claim made during its policy period under the identical "first made" or "interrelated wrongful acts" provision in its policy.  Thus, the "interrelated wrongful acts" provision of the Hartford/Twin City Policy provides that the underlying fraudulent conveyance actions constitute a single claim that was first made under the Reliance Policy and before the inception of the Hartford/Twin City Policy.

> 2.    The Hartford/Twin City Policy and the Reliance Policy are Two Separate and Distinct Policies

In response, Plaintiffs argue that the Hartford/Twin City Policy and the Reliance Policy should be treated as *one continuous policy with one policy period*.  In support of this position, Plaintiffs offer the theory proffered by their expert, Donald Bendure, that "[t]he insurance industry drafted the 'interrelated wrongful acts' provision to prevent policyholders from recovering more than

one policy's liability limits when related claims trigger successive D&O policies."  Pl. Opp'n Br to Summary Judgment Motion as to Hartford Policy at 11 (citing *inter alia* John F. Olson & Josiah O. Hatch, <u>Director and Officer Liability Indemnification and Insurance</u>, § 10.06[5] (1999)).  However, Plaintiffs cite no case law to support this position.  Thus, Plaintiffs' lengthy arguments regarding why the Reliance and Hartford/Twin City policies are not "truly successive" are of minimal persuasive value.

This Court finds Plaintiff's expert's theory unpersuasive due to the fact that it is based largely on speculation and unsupported facts.  First, Plaintiff's expert based his opinion on GAF's Risk Manager Robert Flugger's "understanding of what he was doing."  <u>See</u> Montague Reliance Cert., Ex. O, Bendure Tr. at p. 72.  However, Flugger's "understanding of what he was doing" does not reflect that he believed that the Reliance and Twin City/Hartford policies were a single continuous policy.  Rather, Flugger's deposition testimony indicates that he understood that the Reliance and Twin City/Hartford policies were separate and not continuous:

> Q:    So you understood that you were going to have a Hartford policy from a certain date, it would be effective from a certain date agreed upon, and your Reliance policy would be canceled as of that date; is that correct?
> A.    Yes.
> Q.    Okay.  You understood that they were two separate policies; is that correct?
> Mr. Chiafullo: Objection.  You can answer.
> A.    They would have been two separate policies.

Certification of Celestine M. Montague in Support of Summary Judgment by Hartford Fire Insurance Company and Twin City Fire Insurance Company as to Plaintiffs' Claims Under the Twin City Policy ("Montague Hartford Cert.") Ex. M, Excerpts of Deposition Transcript of Robert Flugger ("Flugger Tr.") at p. 63. Moreover, it is highly problematic that Bendure's opinion is not based upon the insurance contracts and documents in question.  As set forth above, this Court is required to

-16-

interpret the plain meaning of the insurance policies themselves.  See Benjamin Moore & Co., 179
N.J. at 102; see also Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960).  Further, this Court must
enforce the policies as written.  See Id.; see also Conduit and Found. Corp. v. Hartford Cas. Ins. Co.,
329 N.J. Super. 91, 99 (App. Div.) certif. denied 165 N.J. 135 (2000) (holding that when an
insurance policy is unambiguous, the court must enforce it and should not consider the probable
intent and reasonable expectations of the parties).  Thus, the opinion of an insured's employee is not
this Court's primary consideration when determining whether coverage exists.

Additionally, Plaintiffs argue that Hartford's conduct indicates that it was not acting as a true
successor insurer and thus, the Reliance and Hartford/Twin City policies operated as a single D&O
policy spanning the period from July 1, 1999 through July 1, 2002 (the Reliance Policy's original
coverage period.)  See Pl. Opp'n Br. Summary Judgment Motion as to Hartford Policy at 13-17.
Plaintiffs' various arguments offered to support this position are based on unsupported factual
allegations and lack citations to any case law.  Plaintiffs argue that despite the fact that they were
represented by a sophisticated insurance broker throughout their transactions with Reliance and
Hartford/Twin City, they misunderstood how the policies were to operate in relation to one another.
However, as Defendants note, a unilateral mistake of fact, unknown to the other party, does not
warrant avoidance of a contract.  See Ctr. 48 Ltd. P'ship v. The May Dep't Stores Co., 355 N.J.
Super. 390, 412 (App. Div. 2002).  Additionally, Plaintiffs stop tellingly short of claiming that they
actually believed that the policies were a single continuous policy.  Rather, Plaintiffs merely argue
that the Court should find that the two separate policies are continuous because (1) "[n]either
Hartford nor Reliance ever explained to plaintiffs the operation of the two policies;" (2) "plaintiffs
paid no additional premiums for Hartford's assumption of Reliance's coverage obligations;" (3)

"Hartford engaged in none of the underwriting activities typically undertaken by a true successor insurer;" and (4) "the Reliance and Hartford Policies share identical policy language." Pls. Opp'n Br. to Summary Judgment Motion as to Hartford Policy at 13-16. Particularly in light of the fact that Plaintiffs do not claim that they actually misunderstood the operation of the two policies, this Court is unpersuaded that any of this extrinsic evidence gives reason for the Court to conclude that the plain and clear terms of the Hartford/Twin City policy should not be enforced.

### 3.   Inapplicability of Judicial Estoppel Doctrine

Lastly, Plaintiffs argue that the doctrine of judicial estoppel prevents Defendants from repudiating their prior representations to the Court. Specifically, Plaintiffs argue that Hartford's previous arguments that the CCR and OCAC actions fall outside the Reliance Policy and that the "'Nettles' Claim falls within the Reliance Policy" are inconsistent with its current position. Pls. Opp'n Br to Summary Judgment Motion as to Hartford Policy at 3 (citing Corona Cert., Ex. DD, p. 19). Plaintiffs contend that Defendants have played "fast and loose" with the Court by now contending that the CCR and OCAC actions fall within the Reliance Policy. Id. at 4 (citing Bronze Shields v. City of Newark, 214 F. Supp. 2d 443, 449 (D.N.J. 2002)).

Plaintiffs noticeably fail to mention the fact that Hartford withdrew this argument and the Court never ruled on it. The "extraordinary remedy" of judicial estoppel may only be granted when the party prevailed on the previously asserted position. Kimball Int'l., Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 606-08 (App Div.) certif. denied 167 N.J. 99 (citing inter alia Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3d Cir. 1996)). This element is not present here because this Court never reached a decision regarding Hartford's earlier arguments; thus, the previously asserted and allegedly inconsistent position was never adopted by

this or any other Court.  Plaintiffs' argument that the doctrine of judicial estoppel should apply is unavailing.

Plaintiffs contend more broadly that Hartford breached its duty of full disclosure and candor to the Court by concealing its own D&O Policy.  The evidence shows that Plaintiffs were on notice or should have been on notice of the D&O Policy it had taken out with Hartford/Twin City. Plaintiffs cite no testimony or evidence stating that they misunderstood how the policies were to operate.  As stated above, GAF, through its insurance broker, elected to cancel the Reliance Policy and purchase a new policy.  Montague Hartford Cert., Ex. M (Flugger Tr.) at pp. 61, 63, 65-7, 96-7. There is no indication in the record that Hartford concealed the Twin City Policy.  Rather, the record indicates that (1) Plaintiffs' own Risk Manager approved the cancellation of the Reliance Policy and the issuance of the Hartford/Twin City Policy; (2) a copy of the Hartford/Twin City Policy was received; (3) Plaintiffs recovered this Policy in their own files; and (4) the renewal of this Policy was negotiated during the pendency of this action during 2002.  See Certification of Celestine M. Montague in Support of Hartford Fire Insurance Company's Briefs in Opposition to Plaintiffs' Motions for Summary Judgment ("Montague Opp'n Cert."), Ex. C., Excerpts of Deposition Transcript of Robert Flugger  ("Flugger Tr.") at pp. 17, 27, 51-56, 61, 65-67, 96-97; Pls. Br. in Support of Summary Judgment on the Inapplicability of Hartford's "Interrelated Wrongful Act" Provision at 15.

Based on the foregoing, it is the finding of this Court that Defendants are under no duty to provide coverage to Plaintiffs under the terms of the Hartford/Twin City policy.  Specifically, the "interrelated wrongful act" provision of the Hartford/Twin City policy obviates Defendants' obligation to provide coverage for Plaintiffs' clams regarding the Nettles, CCR and OCAC actions.

Due to their interrelated nature, these claims were "first made" prior to the inception of the Hartford/Twin City Policy. Thus, this Court will not analyze the applicability of the pollution and CGL exclusions or whether the claims constitute an insurable "loss."

**B.      Defendants' Liability As To Plaintiffs' Claims Under the Reliance Policy**

In addition to Plaintiffs' claims under the Hartford/Twin City Policy, Plaintiffs also contend that Defendants are obligated to provide coverage for claims based on the Nettles, CCR and OCAC actions pursuant to the Reliance Policy. According to Plaintiffs' theory, Defendants are obligated to provide coverage under the Reliance Policy because Defendants "stood in the shoes" of Reliance with respect to Plaintiffs' coverage claims. Pls. Opp'n Br to Summary Judgment as to Claims Under the Reliance Policy at 1.

To support this position, Plaintiffs primarily rely on the alleged conduct of Reliance and Defendants, characterizing Hartford as more than "just a reinsurer" of Reliance. Id. at 18. With minimal reliance on the actual contracts formed between Defendants and Reliance, Plaintiffs broadly contend that "Hartford purchased Reliance's D&O insurance business, and indisputably assumed responsibility for 100% of Reliance's non-reinsured obligations for certain D&O claims." Id. at 15. Plaintiffs attempt to characterize the transaction between Defendants and Reliance as one wherein Defendants effectively took over all of Reliance's business and assumed its obligations to policyholders. However, notably absent from Plaintiffs' argument are citations to the language of the contracts between Reliance and Defendants. Plaintiffs ask this Court to find that pursuant to the APA, Reinsurance Agreement and Claims Servicing Agreements Defendants became obligated to provide coverage to Reliance policyholders; however, Plaintiffs do not identify any language that would support such a conclusion. In fact, as set forth more fully below, the language of the relevant

documents shows that Defendants explicitly did not assume coverage responsibilities for Plaintiffs' claims.

Additionally, Plaintiffs argue that they were unaware of the transactions between and Reliance and Defendants, claiming that they "discovered, in or around November 2002, that (1) the Reliance Policy terminated on July 15, 2000; and (2) Hartford Fire Insurance Company [] sold to plaintiffs a replacement primary D&O policy, 0152124-99BH, which covers the remaining Reliance Policy period from July 15, 2000 through July 1, 2002." Id. at 3 (citing Corona Cert., Ex. B). This claim is entirely unsupported by the evidence because, as stated above, GAF's Risk Manager, was aware of Reliance's financial difficulties and elected to cancel the Reliance policy and obtain a policy from Defendant. Montague Reliance Cert., Ex. G, Flugger Tr. at pp. 61, 63, 65-67. Further, Plaintiffs seek relief due to "how unclear the insurers' machinations left the entire coverage situation." Pls. Opp'n Br to Summary Judgment as to Claims Under the Reliance Policy at 17. However, this argument is unavailing because the language of the relevant contracts is unambiguous and clearly sets forth the parties' respective obligations. As set forth immediately below, neither the Hartford/Twin City Policy, the APA, the Reinsurance Agreement, nor the Claims Servicing Agreements obligate Defendants to provide coverage to claims pursuant to the Reliance Policy. Moreover, these documents establish that Defendants did not assume or guarantee Reliance's obligations pursuant to the Reliance Policy.

        1.      <u>Hartford/Twin City Policy</u>

As Defendants correctly note, there is no language in the Hartford/Twin City Policy indicating that Defendants assumed or guaranteed the liabilities of Reliance. Not only is the policy clear on the fact that Defendants did not assume Reliance's obligations, but additionally, Plaintiffs'

Risk Manager understood this fact.  As set forth above, Flugger understood that the Reliance policy is a separate and distinct policy from the Hartford/Twin City Policy.  See Montague Reliance Cert., Ex. G, Flugger Tr. at pp. 63, 97.   Additionally, Flugger understood that Reliance remained responsible for claims made under the Reliance Policy.  See id. at 94.  Thus, not only is the Hartford/Twin City Policy clear that Defendants were not obligated to provide coverage under the Reliance Policy, but the extrinsic evidence also shows that Plaintiffs understood this fact.

2.	<u>APA</u>

Similarly, the APA does not obligate Defendants to provide coverage on Plaintiffs' claims.  To the contrary, the APA limits Defendants' assumption of liabilities.  As set forth above, Paragraph 1.2 of the APA states that other than its obligations under the Reinsurance Agreement, Hartford "*shall not assume any liabilities* of Holdings or any of the Reliance Companies of any nature whatsoever, whether absolute, contingent, or otherwise, by reason of this Agreement or the transactions contemplated hereby."  Montague Reliance Cert., Ex. H, APA, p. 2 (emphasis added).  By entering into the APA to purchase the assets and renewal rights to Reliance's D&O book of business, Defendants did not simultaneously assume Reliance's obligations to its policyholders.  The language of the APA is unmistakably clear on this point.

3.	<u>Reinsurance Agreement</u>

The Reinsurance Agreement does not contain language that requires Defendants to provide coverage for Plaintiffs' claims.  As an initial matter, it should be noted that Plaintiffs are not parties to the Reinsurance Agreement.  Rather, the Reinsurance Agreement is a contract wherein Hartford agreed to reinsure Reliance for a limited class of claims.  As set forth above, Hartford's obligation to reinsure Reliance is limited by the definition of "Ultimate Net Loss": Hartford is only required

-22-

to provide reinsurance for "Losses, Allocated Loss Expense, Extracontractual Obligations, and Losses Excess of Policy Limits *that the Ceding Company has paid*." Corona Cert., Ex. Z, p. 3 (emphasis added). Thus, Hartford has no obligation to reinsure Reliance until Reliance has made payments on the claims at issue. Providing even more clarification, the Reinsurance Agreement further states that "[n]otwithstanding the foregoing, all claims under the In-Force Policies which are defended, adjusted or settled by Reinsurer shall be paid by the Ceding Company [Reliance], and not directly by the Reinsurer." Id. at 5.

Moreover, even if Hartford becomes obligated to reinsure Reliance, Plaintiffs have no right to the reinsurance proceeds based on the Reinsurance Agreement alone. Specifically, this Court has previously concluded that "[u]nder this reinsurance relationship, there is no direct benefit to insureds, including Plaintiffs, and the Quota Share Reinsurance Agreement expressly states that Reliance is to pay all claims even if they are adjusted or administered by Hartford." Montague Reliance Cert., Ex. N., March 23, 2004 Op., p. 26; see also Owens-Illinois Inc. v. United Ins. Co., 264 N.J. Super. 460, 494 (App. Div. 1993), rev'd in part on other grounds, 138 N.J. 427 (1994) (holding that original insured are not third party beneficiaries to reinsurance agreements)

In response, Plaintiffs ask this Court to ignore its previous finding that the Reinsurance Agreement does not vest Plaintiffs with a right to reinsurance proceeds and, instead, adopt the very narrow holding of a clearly distinguishable case. Relying heavily on Venetsanos v. Zucker, Plaintiffs claim that Hartford, as a reinsurer, possesses "the obligations of a primary insurer to [plaintiffs]." Pls. Opp'n Br to Summary Judgment as to Claims Under the Reliance Policy at 28 (citing 271 N.J. Super. 459 (App. Div.) certif. denied 138 N.J. 166 (1994)). In Venetsanos, the Appellate Division "recognize[d] and endorse[d] the general rule that an original insured does not enjoy a right of direct

action against a true reinsurer." 271 N.J. Super. at 472 (citing Appleman, Insurance Law and Practice, § 7694). However, the court noted that where "the reinsuring agreement itself provides, or the conduct of the reinsurer demonstrates, that it takes charge of and manages the defense of suits against the original insured, the reinsurer may be held to be a 'privy' to the action" and it may be appropriate to "pierce" the "technical veil of reinsurance." Id. at 469, 473. Here, the language of the reinsuring agreement explicitly does not provide that Defendants take charge of and manage suits against Plaintiffs. In regards to conduct, the Appellate Division noted that a reinsurer's duty to the primary insured "usually depend[s] on whether, in the total relationship, the reinsurer has some degree of control over the decisions concerning settlement with the third party claimant." Id. at 473. In this case, Defendants did not have complete or final control over Plaintiffs' claims made under the Reliance Policy. Defendants concede that they were involved in the adjustment and settlement of claims; however, the undisputed facts reveal that Reliance retained ultimate authority over the settlement and payment of claims. See. Pls. Resp. nos. 51-58 (admitting that the claims servicing agreements are not insurance policies and that Reliance retained (1) authority for coverage determinations; (2) responsibility for funding claims; and (3) authority for setting forth discretionary settlement limits). Thus, in light of the clear contractual language of the Reinsurance Agreement and the conduct of the parties, it is inappropriate for the Court to pierce the alleged reinsurance veil in this case as the Venetsanos court did.

                4.      Claims Servicing Agreements

Lastly, the Claims Servicing Agreements do not contain language obligating Defendants to provide coverage for Plaintiffs' claims. Rather, the Claims Servicing Agreements obligate Hartford to act as a third-party administrator to adjust certain claims pursuant to the APA. The Claims

Servicing Agreements are clear on the fact that they do not substitute Hartford for Reliance as the insurer *nor* do they obligate Hartford to make payments to policyholders. Specifically, both Claims Servicing Agreements provide that

> Service Company [Hartford] does not act as an insurer for any insured, and this Agreement shall not be construed as an insurance policy or any contract or agreement of indemnity; it being understood that Service Company is in no event financially responsible for payment or satisfaction of "claims," lawsuits, or any form of cause of action, against any 'named insured' under the "policy[ies]"

Montague Reliance Cert., Ex. K, Pre-July 1 Claims Agreement, p. 18; Montague Reliance Cert., Ex. L, Post-July 1 Claims Agreement, p. 14. The agreements further provide that "[u]nder no circumstances will Service Company [Hartford] use its own funds to make any payment to any insured or third party." Montague Reliance Cert., Pre-July 1 Claims Agreement, p. 24; Montague Reliance Cert., Ex L, Post-July 1 Claims Agreement, p. 20. Based on these contractual provisions, it is clear that they do not obligate Defendants to make payments on Plaintiffs' claims under the Reliance Policy.

### C.   Plaintiffs' Bad Faith Claims

As set forth above, it is the finding of this Court that Plaintiffs are not entitled to coverage from Defendants. Accordingly, they may not prevail on their bad faith claims. New Jersey law provides that "[i]n order to impose 'bad faith' liability the insured must demonstrate that no debatable reasons existed for denial of the benefits available under the policy." Hudson Universal v. Aetna Ins. Co., 987 F. Supp. 337, 342 (D.N.J. 1997) (citing Pickett v. Lloyd's, 131 N.J. 457, 472 (N.J. 1993)); Tarsio v. The Provident Ins. Co., 108 F. Supp. 2d 397, 400-01 (D.N.J. 2000). Here, Defendants did not act in bad faith in denying coverage and investigating Plaintiffs' claims because, as this Court has concluded, there was no basis for Defendants to provide coverage. Thus,

Defendants' reasons for denying coverage were not "debatable," rather, they were sound reasons, supported by the relevant law and facts.

**VI.**     **CONCLUSION**

For the reasons stated, it is the finding of this Court that Defendants' motions for summary judgment are **granted** and Plaintiffs' motions for summary judgment are **denied**.  An appropriate Order accompanies this Opinion.

          S/ Dennis M. Cavanaugh
         Dennis M. Cavanaugh, U.S.D.J.

Date:     March   16,   2007
Orig.:    Clerk
cc:       Counsel of Record
          The Honorable Mark Falk, U.S.M.J.
          File